FILED

2008 Mar-28  AM 09:27
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| ELIZABETH TAFF DOYLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: 5:06-cv-0877-RRA |
| | ) | |
| CITY OF CULLMAN BOARD OF | ) | |
| EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF OPINION**

This is a civil action filed by the plaintiff, Elizabeth Doyle, against the City of Cullman Board of Education.  The complaint alleges one count of age discrimination in violation of the Age Discrimination in Employment Act (29 U.S.C. § 621, *et seq.*) ("ADEA").  The plaintiff contends that she was fired due to her age, and that, when her former position again became available, the defendants did not rehire her due to her age.  This case comes before the court on the defendant's motion for summary judgment.

I.      STANDARD OF REVIEW

In conducting [a summary judgment analysis], [the Court must] view all evidence and factual inferences in the light most favorable to the nonmoving party. *Id.* Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment. *Id.*

*Lofton v. Secretary of Dept. of Children and Family Services,* 358 F.3d 804, 809 (11th Cir.

2004).

II.    FACTS

    A.    <u>Doyle's Employment by the Board</u>

Plaintiff Elizabeth Taff Doyle ("Doyle") was hired by Defendant City of Cullman Board of Education ("the Board") as a business marketing teacher at Cullman High School in August 2002.  She was 47 years old at the time.

In the Fall of 2004, upon the recommendation of Cullman High School principal Lane Hill ("Hill"), Doyle was promoted to business marketing teacher and co-op coordinator. Those students who participate in the co-op program work at various jobs during school hours and are evaluated by their employers on their job performances.  As business marketing teacher and co-op coordinator, Doyle  (1) taught the coordinated studies classes, seminar class, and other business marketing classes; (2) oversaw the co-op program, including communicating with the employers about program requirements; (3) counseled the students regarding problems at their places of employment and their future career plans; and (4) assigned grades to the co-op students based upon their classroom and job performances. (Doyle Depo. 92-97.)

    B.    <u>Evaluation of Co-Op Students by an Employer</u>

In determining the overall grade of a student in the co-op program, "[t]he grade from the employer is 75 percent of the student's final grade. The grades from the classroom is 25 percent."  (Doyle Depo. 120.)  When completing an evaluation of a co-op student, an employer uses a form developed by the Alabama State Department of Education. The evaluation form has two different sections for evaluation: "personal qualities" and "job tasks."

2

The "personal qualities" section of the form provides ten "personal qualities" for an employer to score: attendance, appearance, dependability, leadership, industriousness, mental alertness, thoroughness, ability to get along with others, social habits, and willingness to work.  The employer scores the student 0-6 in each "personal qualities" category.  According to the "qualities key" on the evaluation form, a six is "excellent," a four or five is "good," a two or three is "fair," a one is "poor," and a zero is "unacceptable."

With respect to the "job tasks" section, the employer can list as many as 15 specific "job tasks" and score the co-op student 0-10 on each task.  According to the "tasks key" on the form, nine to ten is "excellent," six through eight is "good," three through five is "fair," one or two is "poor," and zero is "undesirable."

The students receive an "average" score by dividing the total number of points awarded by the total possible points the student could have received.  Doyle assigned the "average" score from the employer evaluation form as each student's numerical work experience grade.  It is at this point that the terminology becomes confusing.  In order to clarify this opinion, the scores given by the employer on the form itself, and the average of those scores, will be called the "employer's score."  The corresponding grade given to that score by Doyle will be called the "work experience grade."

The school system recognizes numerical grades as follows: 90-100 is an "A";  80-89 is a "B"; 70-79 is a "C"; 60-69 is a "D"; and anything below 60 is an "F."  It is the job of the school to interpret the employer's score and to assign a work experience grade.  (Hill Depo. 50-51, 53.)  For example, if an employer believed a student was "good" in each of the  ten "personal qualities," and assigned a corresponding 4 points, that student would receive 40

3

out of 60 total points, which is 66%.  Similarly, if there were seven "job tasks," and the employer chose to give the co-op student a rating of "good" with a corresponding 6 points for each of the job tasks, the student would receive 42 out of a possible 70 points, which is 60%. If traditional grades are then assigned to this percentage by the teacher, then the student's work experience grade would be  a "D."  This would be 75% of his or her overall grade, even though that student was "good" in each "personal quality" and "job task."  The plaintiff testified:

> A.     When I first started using this instrument, I realized how misleading that this scale is.  And once we finished filling everything out or once the employer filled – finished filling this out and we got the final score here, I always made sure that they understood if it said 76, that that meant they were saying this is a C student, regardless of whether they were saying "Good," "Fair," "Poor" or anything throughout here.  Whatever that final score was, I always made sure they understood that it was going to be turned into a school grade.
>
> And in some cases, employers would go back and instead of giving them the bottom number, they would give them the upper number, or they would change it entirely, because they did not want the students to receive a B or a C or a D, or whatever the case may be.

(Doyle Depo. 129.)

C.     Dispute Over Grade Assigned to Co-Op Student Erin Loyd.

Erin Loyd ("Loyd") was one of Doyle's co-op students for the 2004-05 school year. Loyd was employed through the co-op program by Cullman OB/GYN, where her primary supervisor was Angie Glasscock ("Glasscock"), the office supervisor.  On February 2, 2005, Glasscock completed an employer evaluation form for Loyd.  Glasscock gave Loyd ratings of "good" (numerical score of 4-5) in three of the "personal qualities" categories and "fair" (numerical score of 2-3) in the other seven.  Loyd received no rating of "poor" (numerical score of 1) or "unacceptable" (numerical score of 0) in any category.  (Doyle Depo. 144-45,

4

Exh. 11 attached thereto.)  This translated into 35 out of 60 available points, which was 58%. *Id.*

Glasscock also rated Loyd on seven categories of "job tasks."  Loyd received a rating of "good" (numerical score of 4-5) on three of the tasks and "fair" (numerical score of 2-3) on four of the tasks. She did not receive a rating of "poor" (numerical score of 1) or "undesirable" (numerical score of 0) on any job task.  (Doyle Depo. 144-48, Exh. 11 attached thereto.)  This translated into 36 out of 70 available points, which was 51%. *Id.* The total "average" employer score (total points divided by total available points) for "personal qualities" and "job tasks" together was 55%.  *Id.*  Doyle took this employer's score and assigned Loyd a work experience grade of 55, a failing grade (under the school's grading system), even though Loyd's overall score contained six ratings of "good," eleven ratings of "fair," and no ratings of "poor" or "unacceptable."  *Id.*  Loyd had received a perfect 100 score for the classroom portion of her grade which counted for 25% of the total grade.[1] However, due to her work experience grade of 55, she received an overall grade of 66, a "D."

On March 16, 2006, Loyd's parents had a conference with Principal Hill and Doyle about Loyd's co-op grade.  Doyle says she told the parents that she had changed the overall grade to a 70 and that she believed the parents were content with that overall grade.  In fact, Doyle says she manually changed the overall grade from a 66 to a 70 without changing the work experience grade of 55 or the classroom grade of 100.

D.    Hill's Instructions to Doyle

---

[1]The plaintiff contends that Loyd got the 100% score on the classroom portion because the plaintiff raised her score as high as possible to counteract the low work experience grade.

After Loyd's parents had left the meeting, Hill asked Doyle to "ruminate" about changing the work experience grade that Doyle had assigned to Loyd based on the employer's evaluation. Hill suggested that, because Loyd received ratings of "good" or "fair" in all categories, the proper work experience grade should have been somewhere between 70 and 85. According to Doyle, Hill made a "strongly worded suggestion" or a "demand" that Doyle change the work experience grade. (Second Amended and Restated Complaint ¶¶ 20-21.) Hill also told Doyle not to call Glasscock to discuss Loyd's grade.

Hill made this command because Loyd's mother, who worked for the same employer, requested that the meeting not be reported to Glasscock. (Hill Depo. 44-45; Loyd Depo. 49-52.) The plaintiff did not dispute in her deposition that this statement was made. She merely stated that she did not recall it being made, and further that "I can't understand why that statement would have been made because Ms. Glasscock was the one that filled out the evaluation." (Doyle Depo. 180.)

On March 17, 2005, the morning after the meeting, Glasscock called Doyle and said that Loyd's mother had told someone that Hill had changed the employer's evaluation and wanted to know if this was true. Glasscock had knowledge about the issues that were discussed in the meeting with Loyd's parents the previous afternoon. Doyle informed Glasscock that, while she had changed Loyd's overall grade to a 70, she changed the classroom portion of the grade, not the work experience grade. Doyle also told Glasscock that she was instructed by Hill not to call Glasscock about this issue. Glasscock also contacted Hill on the morning of March 17, 2005, and they discussed the issue of Loyd's grade. Hill never asked Glasscock whether Doyle had called her about this issue. (Glasscock Depo. 121.)

6

Hill formed a belief that Doyle had contacted Glasscock about the issues discussed at the meeting with Loyd's parents. (Hill Depo. 55-57.) Hill asked Glasscock whether she intended Loyd's grade to be a "B."  Glasscock responded that she did not intend to give any letter grade.  She concerned herself only with the numeric scores on the sheet.

On or about March 18, Hill asked Doyle whether she was going to change Loyd's work experience grade.  Doyle respond to Hill "[y]ou're not going to like my answer, and no, sir."  Hill turned red in the face, said "big mistake," and walked off.

E.    Non-renewal of Doyle's Employment Contract

Later that same school year, Hill had a discussion with the Board's superintendent, Dr. Jan Harris ("Dr. Harris"), about renewal of Doyle's employment contract.  Because this was her third year of continuous employment by the Board, if the Board failed to give Doyle notice of non-renewal of her contract on or before the last day of the school year, she would have become tenured.

Hill recommended to Dr. Harris that Doyle's contract not be renewed because Doyle was defiant and insubordinate.  Specifically, Hill stated that Doyle refused to change the work experience grade that Doyle assigned to Loyd and that Doyle called the employer to discuss Loyd's grade contrary to Hill's command not to do so.  (Harris Depo. 29-33.)  Dr. Harris then recommended to the Board that it not renew Doyle's contract and the Board voted to approve Dr. Harris's recommendation. On May 25, 2005, Dr. Harris sent a letter to Doyle informing her that the Board had approved the non-renewal of her contract effective May 27, 2005.

F.    Doyle's Application for Business/Marketing Teaching Position Vacated When

7

her Contract Was Non-Renewed

Doyle applied for the business/marketing teaching position that was vacated by the non-renewal of her employment contract. (Doyle Depo. 90.)  Hill stated that he did not consider Doyle for the vacancy because the Board had just non-renewed her contract.  If Hill had wanted to keep her at the position, he would not have recommended non-renewal of her employment contract.  If the Board had employed her during that year, she would have obtained tenure.  Hill did not believe that she should obtain tenure.  Hill Depo. 89, 91, 98; Hill Affid. 4.)

The Board hired Megan Apel ("Apel") for the open position.  In order to be eligible to teach, an applicant must have a teaching certificate or be eligible for certification.  (Hill Depo. 92-93.)  Apel applied for and obtained an emergency teaching certificate.

G.    Other Non-Renewal Decisions By Hill

There have been six non-tenured teachers over 40 years old whose contracts have come up for renewal since Hill has become principal.  Of those six teachers, only Doyle's contract has been non-renewed.  (Second Hill Aff. ¶ 8.)  Two of those non-tenured teachers whose contracts were renewed during Hill's tenure were at least five years older than Doyle. (*Id.* at ¶ 9.)

H.    Plaintiff's Qualifications[2]

The plaintiff's date of birth is October 1, 1954, making her 50 at the time of her termination of employment from Defendant on May 27, 2005.  She left her first employment

---

[2]The facts from this point on are the facts presented by the plaintiff. These facts were not disputed by the defendant.

with Defendant in October, 2001 in order to accept a job as a State Education Department Specialist in charge of business marketing instructors across the state. One aspect of the plaintiff's job with the state was to perform business industry certification (BIC) reviews on school co-op programs.

The defendant's Jack Pennington and Jayne Barnett approached the plaintiff concerning a return to her old position with the high school because they were up for BIC review. The plaintiff asked for tenure to be awarded if she came back, and Pennington and Barnett promised they would try. She did not find out until later in the school year that tenure could not be granted. The plaintiff's performance was given high marks.

The plaintiff transferred from Business Marketing teacher to Co-op Coordinator in the fall of 2004, replacing Susan Bowen. The plaintiff had written the state curriculum for the course.

I.    The Plaintiff's Job as Co-op Coordinator

As Co-op Coordinator, Doyle evaluated students placed with employers. She gave them a grade for the course. The grade was derived from the employer's evaluations as well as their classroom work. She carried on the same grading system used by Susan Bowen before her. As Co-op Coordinator, the plaintiff kept Hill informed of matters, yet rarely received responses to her reports.

Doyle met with the students each week. She counseled them on their careers. She had 31 students in the co-op program, one of whom was Erin Loyd, who worked for Cullman Ob/Gyn as a medical file clerk. Angie Glasscock was Loyd's primary supervisor.

The plaintiff never felt she had any discretion with the employer's score on the form

9

created by the State.  The only discretion the plaintiff had concerned the classroom grade.

Glasscock understood the form when Mr. Kusz, Ms. Bowen's predecessor, first presented it to her.  Glasscock understood she was to put down the number that represented her view of the student's performance.  Glasscock stated, "I am sure she [Plaintiff] felt I could read it and understand that numerically you put in there whatever she achieved for that grading period."  It was a very simple grading sheet.  "She [Plaintiff] respected my intelligence."

J.    Erin Loyd

Glasscock intended for Erin Loyd to receive the numeric score Loyd received on the evaluation form.  She did not want anyone to change the scores she calculated.[3]  Glasscock stated that Loyd struck her as a C student,  was unfriendly, not on task, visited her mom too much, and was not motivated for medical work.  Harris could understand from Glasscock's declaration Erin was not graded very highly.  However, there is no evidence that Glasscock testified that she felt Loyd should have received a failing work experience grade–despite the employer's score she assigned.

Loyd's grade, before changes, was 66.  This was consistent with the grade Erin earned under Ms. Bowen for the first trimester, a 68.  For the year, Loyd received for the first trimester a 68 (D), for the second trimester a 70 (C), and the third trimester an 84 (B).  The

---

[3]The plaintiff's version of these facts used the word "grade" as in "Glasscock intended for Erin Loyd to receive the numeric *grade* Loyd received on the evaluation form.  She did not want the *grades* that she assigned changed."  As stated above, the court has assigned the term "employer's score" to the score that Glasscock gave.  For clarity, the court has changed the word "grade" in these two sentences to "score."  There is no contention that Glasscock gave Loyd anything but numeric scores, not letter grades.

first trimester was under Bowen.  Erin received scores of  71, 88.5, and 102.50 from her employer for the last two trimesters.

K.      The Telephone Conversations With Glasscock

Hill told the plaintiff not to call Glasscock.  Doyle did not call Glasscock, but Glasscock called Plaintiff the next morning.  Glasscock also called Hill.  Hill and Glasscock discussed Loyd's performance and Hill asked if Glasscock thought Loyd was a B student.

L.      Plaintiff Changed Erin Loyd's Grade

The plaintiff entered the grades into a computer system at the school, called STI. Teachers have access to this program through a classroom module, using a password that allows them to see only their students and classes.  STI Office is a different program from the classroom module.   Only the principal, assistant principals, counselors, secretary, and attendance secretary who work with the counselor have access to STI Office.   In the classroom module, a teacher will enter the individual test, average test, and records attendance.  At any point during the year, a teacher can print out a summary of the grades to give a student, but it is an unofficial progress report.

Teachers maintain a paper book form of grades.  The plaintiff  turned in her grade book to the office before she was terminated.  The defendant does not know where that paper grade book is.

When the grading period comes to an end, a software program called the Principal's Module, which is part of STI Office program, allows the principal to view the grade books in order to determine a final grade.  After the grades have been posted, then someone with access to the principal's module can go in and turn it off.  Once turned off, the teacher cannot

11

edit those grades.  The plaintiff did not have STI Office and did not have the password to access STI Office.  Under the teacher's module, once the next trimester has started the teacher cannot go back and change anything from the previous trimester.

The teacher module would be closed by March 16, the date of the parent/teacher conference, to change a grade from the previous trimester.  By that time only Lane Hill, his secretary, Ms. Satterfield, or the Assistant Principal could have changed the grade.

For a week after March 3, 2005, a teacher would have permission to change the grade. Once the program is closed, it is closed for good.  After that a teacher would not have access, but Hill and two others would have.  STI system automatically calculates the letter grades.

M.    The Plaintiff's Non-renewal

Harris never spoke with the plaintiff before recommending her non-renewal.  She did not talk with anyone but Hill.  The plaintiff learned about her non-renewal when it appeared in the local paper.  Harris admitted that she may have made a statement to the local paper that "employees who may be let go are informed by their principals prior to the school board meeting."  Hill thought Doyle did a good job.  No part of the plaintiff's evaluation of what she did in the classroom entered into the decision to terminate her.

After being non-renewed, plaintiff sought to be rehired for the position, but was not interviewed by Hill.  The plaintiff had a business education certification, which is required to lead a co-op program,  and something Hill was looking for in replacing the plaintiff.  Apel did not have such a certification at first, but did receive an emergency certification on January 12, 2006. While Hill was impressed by Apel's business, he never obtained any documents or records for that business, and merely took her word for what she was telling him.  Apel's

teaching experience amounted to 1.5 months.  Apel had no education courses in her resume. Apel had an undergraduate degree only.

At the time he elected to hire Apel and not the plaintiff, Hill was aware that the previous year the co-op program had been selected as one of the top ten programs in the state.  He thinks that would speak to the plaintiff's job performance.  Apel's contract was renewed, even though she still did not have the education courses that were required for the continuing certification after three years.

Hill has hired 23 teachers since he became principal of the high school.  Of those 23, the average age is 32.3.  One of those hired is over 50; two between 40-49 years of age; 8 between 30-39 years of age; and 11 between 20-29 years of age.  Janice Pruett, age 53, applied for the position of Business/Marketing teacher in June 2005.  Her qualifications greatly exceeded those of Apel, who was selected for the position.  Pruett had a masters in business administration.  Hill refused to give Pruett a reason for not granting her an interview.  Jayne Barnett, principal at the middle school where Pruett taught, gave her a favorable letter of recommendation.

N.   Age Comments

Hill told the plaintiff he had never known an old business teacher yet who could teach computers.  After that he did not put her in a position where she would be teaching computer courses.  Hill said he could hire a math or science major fresh out of college.  When the plaintiff moved to the co-op position under Hill, he asked her when she planned to retire. The record reflects that Harris disciplined Hill for, among other things, needing to improve his communication skills.

13

III.    ANALYSIS

    A.    <u>Applicable Law</u>

The Age Discrimination in Employment Act ("ADEA") makes it "unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  To prevail on a claim of discrimination under the ADEA, Doyle must prove that the Board intentionally discriminated against her on the basis of age.  29 U.S.C. § 621 et seq.  Proof of discriminatory motive or intent is essential.  As the Supreme Court has stated:

> when a plaintiff alleges disparate treatment, liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision.  That is, the plaintiff's age must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S.133, 141 (2000).

Doyle alleges that the non-renewal of her employment contract and the subsequent failure to re-hire her were based on her age.  The burden is not on the Board to disprove Doyle's claims or to show that it did not renew Doyle's employment contract or fail to re-hire her for some reason other than age.  *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993).  Doyle bears the ultimate burden of proving that age was the determining factor in the Board's decisions not to renew her employment contract or re-hire her. *Baker v. Sears, Roebuck & Co.*, 903 F.2d 1515, 1519 (11th Cir. 1990).

To survive summary judgment, an ADEA plaintiff must demonstrate a genuine dispute of material fact regarding discriminatory intent.  That intent can be shown three ways:

14

through direct evidence of discriminatory motives; through circumstantial evidence of discriminatory motives; and through statistical evidence of a pattern of discrimination. *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).

Doyle contends that circumstantial evidence makes out a prima facie case of age discrimination. Accordingly, she must show circumstantial evidence which satisfies the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this burden shifting analysis, Doyle is required to make out a prima facie case of age discrimination. *Underwood v. Perry County Comm'n*, 431 F.3d 788, 794 (11th Cir. 2005). At that point, the burden shifts to the Board to articulate a legitimate, non-discriminatory reason for the non-renewal of Doyle's employment contract. *Zaben v. Air Products & Chemicals,Inc.*, 129 F.3d 1453, 1457 (11th Cir. 1997). If the Board does so, the burden shifts back to Doyle to introduce significantly probative evidence showing that the asserted reason is pretext for discrimination. *Id.* Doyle may prove pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Brooks v. County Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006). The ultimate burden of persuasion remains with Doyle. *See E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002). Thus, if Doyle "does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of [the Board's] articulated reasons is pretextual, [the Board] is entitled to summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000)(en banc).

B.    Doyle's Has Made Out a Prima Facie Case.

15

Again, the plaintiff alleges discrimination based on her age in that the board did not renew her contract, and, after her non-renewal, the board did not re-hire her. For the purposes of the instant motion, the defendant concedes that the plaintiff has made out a prima facie case of age discrimination as to both claims. (Def. Br. 13 n. 2.)

C.    The Defendant Has Articulated a Legitimate Non-Discriminatory Reason for the Hiring Decisions.

1.    The Defendant Has Articulated a Legitimate Non-discriminatory Reason for the Non-renewal of the Plaintiff's Contract.

The Board states that its legitimate, nondiscriminatory reason for its failure to renew Doyle's employment contract is that "Doyle disobeyed the demands of her supervisor, Hill, to change Loyd's work experience grade and to refrain from contacting Glasscock to discuss this issue." (Def. Br. 14.)

2.    The Defendant Has Articulated a Legitimate Non-discriminatory Reason for the Failure to Re-hire the Plaintiff.

The Board states that its legitimate nondiscriminatory reason for its failure to re-hire the plaintiff is that "Hill did not consider Doyle for the vacancy because he had just recommended her non-renewal due to his belief . . . that she was defiant and unsubordinate." (Def. Br. 22.)

D.    The Plaintiff Cannot Establish That the Board's Articulated Non-discriminatory Reasons Are a Mere Pretext for Discrimination.

If a defendant carries its burden of producing legitimate, non-discriminatory reasons for its decision, the inquiry becomes one of whether the reasons stated by the defendant were pretextual. Under the established law in this Circuit, a plaintiff can survive a motion for summary judgment or for judgment as a matter of law simply by presenting evidence

16

sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, non-discriminatory reasons. *Evans v. McClain of Georgia*, 131 F.3d 957, 965 (11th Cir. 1997); citing *Combs v. Plantation Patterns*, 106 F.3d at 1530-32.

> The plaintiff now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision... the plaintiff may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).
> ...
>
> The fact finder's disbelief for the reasons put forward by the defendant (particularly if disbelief is accompanied by suspicion of mendacity) then, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons, will permit the trier of factor to infer the ultimate fact of intentional discrimination...

*St. Mary's Honor Center v. Hicks*, 505 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993).

"In order to establish pretext, the Plaintiff is not required to  introduce evidence beyond that already offered to establish the prima facie  case...The burden to avoid summary judgment is not to show by a preponderance of the evidence that the reasons stated were pretext." *Batey v. Stone*, 24 F.3d 1330 (11th Cir. 1994); *Kelliher v. Glickman*, 134 F.Supp.2d 1264, 1275 (M.D. of Ala. 2001).  Rather, Plaintiff's burden at summary judgment is met by introducing evidence that could form the basis for a finding of fact, which when taken in the light most favorable to the non-moving party, could allow a jury to find by a preponderance of the evidence that the Plaintiff has established pretext. *Id.*  Evidence to establish pretext may consist of any weaknesses, implausibility, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons as to allow a reasonable fact

finder to find Defendant's reasons unworthy of credence.  *Hall v. Dempsey*, 111 F. Supp. 2d 1208, 1215 (M.D. Ala. 2000).

>    1.    <u>The Plaintiff Has Failed to Establish That the Board's Stated Reason for Non-renewal of the Plaintiff's Employment Contract is a Mere Pre-text for Discrimination.</u>

The  plaintiff  cites  five  reasons  of  pretext  for  not  renewing  her  contract:   (1)  the defendant's refusal to give the plaintiff a reason at the time she was fired; (2) Hill's testimony that he would have renewed the contract if  the plaintiff had not been up for tenure; (3) the defendant's  alleged  inconsistent  reasons  why  the  plaintiff  was  not  renewed;  (4)  the defendant's failure to take appropriate action to be more fair to the student at issue; and (5) the plaintiff's adherence to the "letter" of the instructions given by Hill.

>    a.    <u>The Failure to Tell the Plaintiff at the Time She Was Fired Why Her Employment Had Come to an End Is Not in and of Itself Evidence of Pre-text.</u>

The plaintiff first cites the case of *Mock v. Bell Helicopter Textron, Inc.*, 2006 U.S. App. Lexis 21660 (11th Cir. August 23, 2006), where the Eleventh Circuit stated:

> We are satisfied that Mock presented sufficient evidence to create a genuine issue of material fact as to whether Bell's reason for his termination was a pretext for age discrimination.  There is a dispute as to when Bell informed Mock of the reason for his termination.  At the time Bell informed him that he was being fired, he insisted that it give him the reason for its decision.  Bell refused to do that.  It was not until later, in a letter, that it told him that he had been terminated for unacceptable performance.  In light of Bell's refusal to tell Mock – at the time it fired him – why his employment had come to an end, a trier of fact reasonably could find that the letter constituted a pretext for discrimination.

It is undisputed that neither Hill nor Harris gave Plaintiff a reason for her non-renewal at the time.   Plaintiff first learned of the claimed reason when informed of Defendant's response to her EEOC charge, months later. The plaintiff insists that this fact alone, in light

of the holding in the *Mock* case, requires that summary judgment be denied. The defendant notes that *Mock* is an unpublished opinion. Pursuant to Eleventh Circuit rules, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2.

*Mock* involves different facts, does not provide any substantive analysis, or indicate that its holding is based on any  general rule of law. Further, *Mock* does not state that evidence of pretext is created *every* time an employer does not give a reason for firing at the time of the decision.  Also, the limited facts in *Mock* show, at the very least, that the plaintiff, at the time he was fired, insisted that the defendant give him the reason for its decision. There is no evidence that the plaintiff here made such a demand on the defendant. Further, the employee in *Mock* was fired. Doyle, a non-tenured teacher, had a one year contract which expired at the end of the school year.  Neither the contract nor Alabama law required that the Board establish cause or provide any reason to non-renew Doyle's employment contract. It is not the case that every teacher whose contract is non-renewed is automatically entitled to a finding of pretext if that teacher does not receive an explanation for the non-renewal at the time of the decision. There is no basis for that interpretation in *Mock* or elsewhere.

In a decision issued after *Mock*, a District Court in the Eleventh Circuit held that a defendant's failure to adequately convey the reason for the plaintiff's termination is insufficient to establish pretext.  *See Lowry v. Regis*, No. 1:05-cv-1970-WSD, 2006 WL 2583224, *2 (N.D. Ga., Sept. 6, 2006).  Other courts agree. *See Passarge v. Sharefax*, 277 F. Supp. 2d 819, 827 (S.D. Ohio 2003) (because the defendant was not required by law to give a reason for plaintiff's termination, defendant's silence in this case does not indicate pretext);

*Steele v. Bluffton*, 31 F.Supp.2d 1084, 1096 (N.D. Ind.1998) ("an employer's silence regarding the reason for taking an employment actions is insufficient to create an inference of pretext").  The mere failure to give a reason for termination is not, alone, evidence of pretext.

      b.    <u>Consideration of the Plaintiff's Tenure Status Is a Valid Non-discriminatory Reason for Non-renewal</u>.

It is undisputed that Hill's recommendation of Plaintiff's non-renewal was relied upon by Harris and the Board. Discrimination can be shown where "the discriminatory animus behind the recommendation caused the discharge . . . if the plaintiff shows that the decision maker followed the bias recommendation without independently investigating 'the recommendation'". *Stinson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999). In such a case, the recommending person  is using the decisionmaker as a mere conduit, or "cat's paw," to give effect to the recommender's discriminatory animus. *Id.*  Where the individual accused of discriminatory animus is an "integral part" of a multi-level personnel decision, their improper motivation may "taint [] the entire…process." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1268 (11th Cir. 1999); *Tucker v. Housing Authority of Birmingham District*, 2007 U.S. App. Lexis 8143, hn 6, 7 (11th Cir. April 5, 2007).

Harris did not do an independent investigation (Harris Depo. 11, 12, 36).  Hill testified by way of his first affidavit, and deposition, that he would have renewed Plaintiff's contract had she been a first or second year teacher (Hill Affid. 14; Harris Depo. 90.) The plaintiff argues that "[i]f [p]laintiff's transgressions were not sufficient enough to terminate her employment were she a first or second year teacher, the fact that she was a third year

20

teacher would not make the transgressions more egregious."  (Pl. Br. 6-7.)

Hill's actual words in his affidavit state:

> If this had been her first or second year, I may have brought her back the next year;
> but it was her third year.  This meant that, unless I recommended non-renewal, she
> would receive tenure.  I was not willing to risk giving tenure to an insubordinate and
> defiant teacher.  I decided that the best thing to do was to recommend non-renewal.

(Hill Affid. 4.)  Accordingly, Hill's testimony establishes that his decision to recommend non-renewal was based on the plaintiff's alleged insubordinance and not wanting to have a *tenured* insubordinant teacher.

      c.    <u>The Defendant's Stated Non-discriminatory Reasons Are Consistent</u>.

The plaintiff next claims that the defendant's stated reason for non-renewal is contrary to Harris's previous testimony.  Harris testified:

> Q.    If the employer says they understood the grading, then is she supposed
> to do anything else?
>
> A.    I don't know.
>
> Q.    Well, if the employer says they understand it and they give a certain
> grade back, is it your understanding that the teacher of that program has a right to
> arbitrarily change that employer's form without their consent?
>
> A.    No, the teacher should not change the employer's grade

(Harris Depo. 66.)  The plaintiff claims that this testimony contradicts the defendant's stated reason for non-renewal, which is that "Doyle disobeyed the demands of her supervisor, Hill, to change Loyd's work experience grade."  There is no contradiction.  Doyle was not asked to change the employer's score, she was asked to change the work experience grade she assigned to the scores the employer gave.

A careful reading of Ms. Harris' deposition from page 62 through 66 shows that the

discussion confusingly centers around a "work grade" given by the employer, and the "grade" assigned by Ms. Doyle to the "work grade" given by the employer.  Ms. Doyle assigned an "F" to the "work grade" or "score" given by the employer. The evidence is clear that it is the "F" that Mr. Hill wanted changed, not the employer's score.  Ms. Harris' quoted testimony, when read in context, and in light of all the other evidence, concerns the "employer's score," not the work experience grade.

Similarly, the plaintiff has cited Harris' testimony that "it was not my understanding that he [Hill] told her [Plaintiff] to change the grade of the employer." (Harris Depo. 71.) However, on the next page of her deposition Ms. Harris testified that the employer's understanding that Loyd was a "B" or "C" student was "in direct contrast with the fifty-five that was put in her gradebook."  Again, the context of the discussion makes it clear that the "F" given by Doyle is different from the actual numeric "scores" given by the employer.  In the passage cited by the plaintiff, Harris was referring to the actual numeric scores given by the employer, not the grade assigned by Doyle.

Also, the fact that Hill testified that he directed the plaintiff to change the grade is not inconsistent with Hill's statement that he did not tell her to change the employer's portion.  Hill testified as follows:

> Q.      On 15, she  - - she writes here that you told her to ruminate or change the employer's grade.  Do you disagree with that?
>
> A.      The employer can't give a grade.
>
> Q.      All right. Well, she wrote grade. Let's just assume for purposes of my question that we talking about score. Did you tell her to change the employer's - -
>
> A.      No.

Q.      - -portion?

A.      No.

(Hill Depo. 88.)  Clearly, Hill states that he did not ask Doyle to change the employer's score

on the evaluation form, and also points out that the employer does not provide a grade.

          d.   <u>How a Previous Teacher Scored Loyd, and Hill's Conduct Towards a Previous Teacher, Is Irrelevant to Whether Doyle Disobeyed Hill</u>.

The plaintiff next argues:

> [i]f the plaintiff did not handle the scoring of the employer's grade correctly for Erin Loyd, justifying her termination, could not the same be true of Susan Bowen?  As shown by PX 3, Bowen gave Loyd a 68 for the grading period before Plaintiff took over, which would be a D.  Why the uproar over Plaintiff following the same form and format, which scored Erin a 66 the very next grading period?  Why was Plaintiff fired when she raised Erin to a 70, which was a C?  Erin had a D performance the previous grading period, and a D before Plaintiff, out of the goodness of her heart, and pursuant to the instructions of Hill, raised her D performance to a C. Was it the conduct of Hill in not asking Bowen to do the same thing that he asked of Plaintiff for the same child telling?  Bowen was in her 30's.  (Hill @ 67).  Defendant's complaint is with the state form, not with the Plaintiff.  The positions are completely contradictory, and therefore pretextual.

(Pl. Br. 9.)  The operative fact is not that Hill asked another teacher to change the grade, it

is that Hill asked Doyle to change the grade and she refused.

          e.   <u>Whether the Defendant Could Have, or Should Have, Taken Steps to Change the Grade Is Irrelevant to Whether the Plaintiff Disobeyed Hill's Instructions</u>.

The plaintiff next makes the following argument:

> Hill talked about fairness as being the justification for wanting to err on the side of the student to be fair to the student (Hill @ 52).  In spite of this, Hill elected not to change the child's grade after he claimed or believed that Plaintiff had not done so (Hill @ 61).  Further, this makes no sense.  Hill, never went back and checked on the other students to insure the same standard was used with them (Hill @ 67), especially the two students shown on PX5, as received the same or worse grades in

23

Erin Loyd.  If he wanted to err on the side of the student, why would he not follow-up on the situation with those children?  Defendant, simply has an indefensible position in this regard.  On the other hand, Plaintiff wanted to do what was right for the child and did so by upping her grade. That was good advice by Harris, that Hill did not heed.  It is clear that Hill had the authority to change the child's grade (Harris @ 75; Hill @ 68).  If the issue involved was fairness to the student (Harris @ 75), why not simply change it himself?  Of course he would have, but for the fact he needed to come up with some justification for firing Plaintiff for an undocumented, non serious claimed disciplinary matter (Harris @ 52).  [If it was serious it would be documented].

(Pl. Br. 10-11.)

This argument is without merit.  The only issue is whether Hill gave the plaintiff a directive that she failed to follow, not whether Hill should have reviewed the other student's scores for fairness.  The fact that he did not is not evidence that his stated reason for the plaintiff's termination – defiance – is pretextual.

> f.    Whether Doyle Actually Called Glasscock First Is Irrelevant to Whether Hill Thought She Did.

It is undisputed that Hill told Doyle not to contact Glasscock.  Hill testified that he believed Doyle had called Glasscock to discuss the issues raised in the parent conference.  Hill's belief was entirely reasonable.  Loyd's mother specifically requested that the meeting not be reported to Glasscock.  It was important to her to keep the conference a secret.  When Glasscock called Hill the next morning, clearly knowing about the parent meeting, it was only reasonable to believe that Doyle had called Glasscock.  While Doyle claims that Hill did not conduct an adequate investigation, her disagreement with Hill's course of action does not change Hill's reasonable belief that Doyle had contacted Glasscock to discuss the issues.

Whether Doyle called Glasscock or Glasscock called Doyle is not relevant.  The pertinent issue is whether Hill believed that Doyle called Glasscock.  *See Holifield v. Reno*,

24

115 F.3d 1555, 1565 (11th Cir. 1997) ("The inquiry into pretext centers upon the employer's beliefs").  "[I]n order to prove pretext, a plaintiff must show that the employer did not honestly believe its proffered explanation." *Arnold v. Rayonier, Inc.*, 181 F.R.D. 549, 557 (S.D. Ga. 1998).  There is no evidence to support a finding that Hill did not have a genuine belief that Doyle called Glasscock to discuss the meeting

> 2.      The Plaintiff Has Failed to Establish That the Board's Stated Reason for Not Re-hiring the Plaintiff is a Mere Pre-text for Discrimination.

Subsection "C" of the plaintiff's brief states the plaintiff's argument regarding pretext. (See Pl. Br. 3-13.)  Nowhere in that subsection does the plaintiff address the board's reason for failing to re-hire the plaintiff.  Based on this fact alone, the plaintiff has failed to carry her burden.

To the extent that Doyle makes an issue of Megan Apel's qualifications in an attempt to demonstrate pretext with respect to the failure to re-hire her, it should be noted that Apel's qualifications are irrelevant.  The evidence demonstrated that the Board had non-renewed Doyle's contract because of defiance and insubordination.  It did not want a teacher with those qualities to obtain tenure.  If Doyle had been re-hired for this position, she would have immediately obtained tenure.  If the Board had wanted this result, it would have renewed her employment contract.  Thus, someone other than Doyle was going to be hired for this position, irrespective of Apel.  There is no evidence that age had anything to do with this decision.  Doyle may not like the reason, but she cannot prove pretext by quarreling with the wisdom of that reason. *Alexander v. Fulton County*, 207 F.3d 1303, 1341 (11th Cir. 2000).

In any event, Apel did receive her emergency certificate to teach for the next school

year.  Doyle may argue that she was more qualified, but the Board determined that having a teacher who was not defiant and insubordinate was more important than Doyle's experience.  It is not the role of the federal courts to re-examine the Board's business judgment.  *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).  Moreover, even if Doyle could show a disparity in qualifications, such a disparity in and of itself is not enough to demonstrate discriminatory intent.  *Lee v. GTE Florida, Inc.*, 226 F.3d 1249 (11th Cir. 2000); *Mitchell v. USBI Co.*, 186 F.3d 1352 (11th Cir. 1999).

IV.   CONCLUSION

Based on the foregoing, the motion for summary judgment is due to be granted and this case dismissed.

DONE this 28th day of March, 2008.

Robert R. Armstrong, Jr.
United States Magistrate Judge